IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 3, 2006

# STATE OF TENNESSEE v. MYRNA JILL JOHNSON HALLE

**Appeal from the Circuit Court for Tipton County**
**No. 4828  Joseph H. Walker, III, Judge**

---

**No. W2006-00195-CCA-MR3-CD  - Filed December 15, 2006**

---

The Defendant, Myrna Jill Johnson Halle, was convicted of reckless aggravated assault and received an effective sentence of twelve years in prison to be served at sixty percent.  On appeal, the Defendant contends that: (1) the evidence was insufficient to support her conviction and established that the Defendant acted in self-defense; and (2) the trial court erred when it sentenced her.  Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES, and THOMAS T. WOODALL, JJ., joined.

Julie K. Pillow and Periann Houghton, (on appeal), Somerville, Tennessee, and Richard D. Cartwright, (at trial), Covington, Tennessee, for the Appellant, Myrna Jill Johnson Halle.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; James Walter Freeland Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I.  Facts

This case arises from the Defendant's conviction for reckless aggravated assault.  The following evidence was presented at trial:

Christine Lowe testified that, on July 4, 2003, she went to the Defendant's house where individuals had gathered to set off fireworks.  She recalled that the Defendant and the victim began to fight in the yard, someone separated the victim and the Defendant, and the victim and the

Defendant went inside the Defendant's home. She heard people fighting inside the house and saw a boy run into the Defendant's home. Lowe then saw the victim run into the yard with a rag over his head, saying, "She shot me." She also saw the boy exit the Defendant's house and heard him say, "She's crazy. She shot him." Eventually the Defendant came outside and said "Don't let him get to a phone," and then the Defendant left in her truck. On cross-examination, Lowe testified that she saw the victim and the Defendant "tussling" with each other but could not recall if the victim kicked the Defendant.

Everett Clay Caudle testified that he and his brother Joey visited the Defendant's house on the 4th of July. He said that the Defendant and the victim dated each other, and they lived in the Defendant's house with the Defendant's mother. They got into a fight, and the victim pushed the Defendant onto the ground. Then, the victim left the Defendant alone and went inside. Caudle heard the Defendant say that she was going to get her gun and shoot the victim in the head, and Caudle stayed outside. The Defendant went inside her home. He heard the victim and the Defendant arguing, and then he heard a boom. Then, the victim came running out of the house and said that the Defendant shot him. Later, the Defendant exited her home and said that she shot the victim, and she needed to find him. Caudle heard the Defendant make a telephone call to Boyd to find out if the victim was at Boyd's house. The Defendant discovered that the victim was at Boyd's house, and she left and drove toward Boyd's house. On cross-examination, Caudle acknowledged that his brother tried to pull the victim off of the Defendant when they were fighting outside.

Boyd testified that, on the night of the crime, the victim knocked on her door. She noticed that the victim looked scared and had a rag on top of his head. The victim said, "She shot me. She shot me." He asked Boyd to call 911, Boyd handed him her phone, and he called 911. The Defendant arrived at Boyd's home and asked the victim to let her take him to a doctor, but the victim refused to leave with the Defendant. The Defendant left Boyd's home. Boyd testified that law enforcement personnel arrived at Boyd's home, and the victim left in an ambulance.

Dennis Vance Gulley, the victim, testified that in 2003 he lived with the Defendant and her mother. He testified that on July 4, 2003 he argued with the Defendant and got hit on the head with a plastic bucket. He went inside the Defendant's home, and she followed him. He recalled hearing a pop noise, feeling something warm running down the back of his neck, and then seeing blood. The Defendant was standing behind him when this occurred. After the victim realized he had been shot, he ran to Boyd's house. The Defendant came to Boyd's house, apologized to him, and told him that the incident was an accident. An ambulance picked him up from Boyd's home and took him to a hospital. He denied threatening, hitting, or kicking the Defendant and hitting or attacking the Defendant's mother. The victim testified that he was formerly engaged to the Defendant and that he did not want her to go to jail. On cross-examination, the victim acknowledged that, when the crime occurred, he was taking Paxil for depression. He did not recall if he took his medication on the day of the crime.

Kenneth McNally, a deputy sheriff with the Tipton County Sheriff's Office, described how he apprehended the Defendant after responding to the call about the shooting. He testified that the

Defendant did not appear to have any injuries. He testified that he went to the crime scene and retrieved a handgun from the Defendant's residence. On cross-examination, Officer McNally testified that he saw a bullet hole in the ceiling at the crime scene.

Bill Daugherty, a criminal investigator with the Tipton County Sheriff's Office, testified that, on the night of the crime, he investigated the crime scene and spoke with the Defendant. She eventually confessed that she shot the victim but initially told Investigator Daugherty that her mother shot the victim. Investigator Daugherty also spoke with the Defendant's mother. He testified that neither the Defendant nor her mother reported receiving any injuries. He saw a bullet hole in the ceiling but did not recover a projectile or slug. Investigator Daugherty went to the hospital and spoke with the victim. The victim had two holes in the back of his head that were two to three inches apart. On cross-examination, Daugherty testified that he did not attempt to retrieve any fingerprints from the gun. He acknowledged that the Defendant told him that she fought with the victim, and the victim had thrown her to the ground on the night of the crime.

Hazel Kelly, the Defendant's mother, testified that, on the night of the crime, the Defendant came inside and turned on the stereo, and then the victim came into the house and yelled, "Turn that G-D, M-F stereo off." Then Kelly heard a loud noise that shook the entire house, and she went into the dining room and saw the victim kicking and choking the Defendant. She heard the victim say, "I'm going to kill you, b-tch." Kelly tried to get the victim off of the Defendant, but the victim knocked her over a couch. The Defendant got away from the victim and went to help Kelley. The victim kept yelling that he was going to kill them. Kelly described the confusion that ensued. She thought that the victim was going to shoot a gun up toward the ceiling to scare the Defendant. Kelly said that she may have bumped the victim's arm causing it to move downwards. The victim said he had been shot and went out the door.

On cross-examination, Kelly acknowledged that the Defendant weighed two hundred and thirty-five pounds in 2003 which was more than the victim weighed. She acknowledged that she did not tell law enforcement officers that the victim knocked her over a couch or that she bumped the Defendant's arm. She said that she told officers that the victim threatened to kill the Defendant but acknowledged that this allegation was not in a written statement she made to the police. Kelly acknowledged that after the Defendant shot the victim she did not call the police to inform them that her daughter had been attacked and had shot the victim in self defense.

Joey Caudle testified that on the 4th of July he saw the Defendant and the victim fight with each other at the Defendant's house. The victim pushed the Defendant and threw her onto the ground. He said that the Defendant called for help, he hit the victim on the head with a hubcap, and the victim then let the Defendant go. The victim went inside the home and the Defendant followed him. He heard them arguing inside. Next, he heard a gunshot and saw the victim come running out of the house. The victim said that he had been shot and ran to Boyd's house. He recalled that the Defendant told everyone to go after the victim and to keep him from using the phone. On cross-examination, he acknowledged that he hit the victim with a plastic hubcap. He also testified that the Defendant and her mother did not appear to have any injuries after the altercation.

The Defendant testified that, on the night of the crime, she fought with the victim, he knocked her onto the ground, and the Caudle boys tried to help her. She said that the victim is a strong man and that she is in terrible physical condition because she is overweight. The Defendant recalled that she went inside her home and told her mom that the victim was trying to kill her. She said that the victim knocked her and her mother down. She asked the victim to stop hurting her and went to get her gun. She testified that she intended to shoot it in the air in the hope that it would scare the victim so that he would leave her and her mother alone. She recalled a previous incident when the victim had not taken his medication and became violent and spastic. She testified that she had called the police to her home on account of such behavior. The Defendant acknowledged that she is a drug addict and that she has been convicted of forging checks. On cross-examination, the Defendant did not recall telling Investigator Daugherty, "My mother shot [the victim]," when he first started questioning her. She also denied saying that she was going to shoot the Defendant and asking the Caudle boys to get the victim before he contacted authorities.

## II. Analysis

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, and all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A person commits reckless aggravated assault when he or she "[r]ecklessly causes an assault as defined in § 39-13-101 (a)(1), and: (A) Causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102 (a)(2) (2003); see § 39-13-101(a)(1) (2003) (defining assault as "intentionally, knowingly or recklessly causes bodily injury to another."). In this context, the term "reckless":

> refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c) (2003).

Tennessee's self-defense statute, Tennessee Code Annotated section 39-11-611(a) (2003), provides as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

In the case under submission, the evidence was sufficient to convict the Defendant of reckless aggravated assault. The Defendant admitted to knowingly retrieving the revolver and shooting the victim. Everett Clay Caudle testified that he heard the Defendant say that she was going to shoot the victim. The jury appears to have rejected the notion that the Defendant acted in self-defense and that the Defendant only meant to scare the victim by shooting at the ceiling. We note that this court will not re-weigh the evidence, reevaluate the evidence, or substitute its evidentiary

inferences for those reached by the jury. Accordingly, the evidence presented at trial was sufficient for a rational trier of fact to conclude that the Defendant committed reckless aggravated assault, and the Defendant is not entitled to relief on this issue.

## B. Sentencing

At sentencing, the Defendant testified that she had a drug problem and moved to a calm and peaceful area in Arkansas in order to stay away from her old friends and to obtain a peace of mind. She said that she has cervical cancer, and she has not met with doctors while in prison. She also testified that she would take care of her mother full-time if sentenced to community corrections, and she is the only person who can consistently care for her disabled mother. On cross-examination, the Defendant acknowledged that she has a pending methamphetamine charge in Mississippi. The Defendant argued that she should not be sentenced as a career offender because her prior convictions mainly consisted of nonviolent offenses concerning forged checks. The Defendant also argued that she did not exhibit a sustained intent to violate the law, and the victim did not suffer from a major injury. The trial court held that:

> The State filed notice that it would seek to have the defendant tried as a career offender. Notice was filed long before trial, back in March of 2004.
>
> The Court has reviewed the presentence report, the judgments that have been made Exhibit 1, and find[s] that the defendant has for enhancement purposes seven prior felony convictions . . . .
>
> Under T.C.A. 40-35-108 anyone convicted of a class D, having at least six prior felony convictions of any classification, is to be considered as a career offender.
>
> So the Court sentences the defendant as a career offender to 12 years for the conviction .
>
> The defendant is not eligible under T.C.A. 40-35-303 for probation.
>
> The length of the sentence would not prevent the defendant from being qualified for alternate sentencing under T.C.A. 40-36-106. However, the statutory provisions require that the sentence - - convicting sentences be for property related, drug/alcohol related offenses. People who are convicted of violent felony offenses and specifically offenses where a weapon was used are not eligible for alternate sentencing.
>
> Under the facts of this case, the jury heard testimony from multiple witnesses, including the defendant. The defendant testified that the victim was acting in an irrational manner, and she got her gun. Her testimony I believe was she intended to shoot in the air to ward off the victim, but she ended up shooting him. That's not the

same testimony as the other witnesses and victim. But in any event, even under her testimony, a gun was involved. So the jury made a factual determination, finding the defendant guilty of a lesser-included offense of reckless aggravated assault.

But still, under the facts of the case, since a weapon was involved and injury did ensue, the Court finds she's not a qualified offender for the Community Corrections Act sentencing.

In addition to the judgment sentencing the Defendant to twelve years in prison, the trial court issued an order, stating:

The court finds that due to the seriousness of the offense, the defendant's record, and the fact she continues to persist in criminal behavior, the court finds that confinement is necessary to avoid depreciating the seriousness of the offense, and for deterrence, and that probation has been tried without success in the past.

Measures less restrictive than confinement have been applied unsuccessfully. defendant possesses a criminal history evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation.

The court finds that probation is not appropriate since the defendant received a career sentence of 12 years, it is therefore ORDERED that the defendant's petition for probation is denied.

The Defendant appeals contending that the trial court erred when it did not consider her eligible for a community corrections sentence based on special needs. Specifically, the Defendant contends that her health problems, her mother's health problems, and her drug addiction constitute "special needs" that render her suitable for a community corrections sentence. The state contends that the trial court properly sentenced the Defendant.

When a defendant challenges the length or manner of service of a sentence, it is the duty of this Court to conduct a de novo review of the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is "'conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001) (quoting State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). In conducting a de novo review of a sentence, we must consider: (a) any evidence received at the trial and/or sentencing hearing; (b) the presentence report; (c) the principles of sentencing; (d) the arguments of counsel relative to sentencing alternatives; (e) the nature and characteristics of the

offense; (f) any mitigating or statutory enhancement factors; (g) any statements made by the defendant on his or her own behalf; and (h) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging a sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401(d), Sentencing Comm'n Cmts.

In the case under submission, we conclude that there is ample evidence that the trial court considered the sentencing principles and all relevant facts and circumstances. Therefore, we review its decision de novo with a presumption of correctness. Accordingly, so long as the trial court complied with the purposes and procedures of the 1989 Sentencing Act and its findings are supported by the factual record, this Court may not disturb this sentence even if we would have preferred a different result. See Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts; State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The trial court concluded that "due to the seriousness of the offense, the defendant's record, and the fact she continues to persist in criminal behavior, the court finds that confinement is necessary to avoid depreciating the seriousness of the offense, and for deterrence." Based upon our review, we conclude that the trial court did not err by ordering the Defendant to serve her entire sentence in prison. The Defendant asserts that the trial court erred "in not considering her eligible for community corrections based on special needs . . ." She appears to argue entitlement under the "special needs" provision of the community corrections statute. See Tenn. Code Ann. § 40-36-106(c) (2003). However, in order to be eligible under this section, the Defendant must also be eligible for probation. State v. Staten, 787 S.W.2d 934, 936 (Tenn. Crim. App. 1989). Because the Defendant received a twelve-year sentence, she is not eligible for probation. Tenn. Code Ann. § 40-35-303(a) (2003). She is therefore not eligible for community corrections under section (c). The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

-8-